MR. JUSTICE SHEEHY
delivered the opinion of the Court.
Jacob H. Woods was convicted of two counts of deliberate homicide in District Court, Eleventh Judicial District, Flathead County, involving the deaths of Ronald Johnson and Phillip Kessner. He appeals his conviction to this Court. We affirm.
The most important issues raised by Woods are that the Youth Court proceedings against him were constitutionally defective, and that he was charged in District Court on an information that was unsupported by affidavit or sworn testimony.
That the Youth Court proceedings against Woods were de *405 fective is eminently obvious. The petition initiating the proceedings in Youth Court did not state the facts constituting the offenses with which he was charged in ordinary, concise language so as to enable a person of common understanding to know what was intended. Section 41-5-501(1)(c), MCA. The petition did not include a list of the witnesses the State intended to use in proving the commission of the offenses against him. Section 41-5-501(7), MCA.
The petitioner was arrested in Woodward County, Oklahoma. After he was brought to Montana, he was detained without any sworn statement presented to the court that Woods needed to be placed in detention. Section 41-5-502(4), MCA.
However, by what process or authority Woods was arrested in Woodward County, Oklahoma, is not shown in the record. As far as the record discloses, he was not taken into custody “by a law enforcement officer pursuant to a lawful order or process of [the] court.” Section 41-5-302(1)(a), MCA.
A warrant for the arrest of Woods was issued out of the Youth Court on March 19, 1981. On that date he was already in the custody of the sheriff of Woodward County, Oklahoma. There is no provision in the Youth Court Act for the issuance of a warrant of arrest. Presumably the warrant of arrest, therefore, was issued under section 46-6-201, MCA. However, a warrant of arrest is invalid unless it is based upon probable cause, supported by oath or affirmation reduced to writing. Art. II, § 11, 1972 Mont. Const.; State ex rel. Wicks v. District Court (1972), 159 Mont. 434, 498 P.2d 1202; Petition of Gray (1970), 155 Mont. 510, 473 P.2d 532. Here there was no showing of probable cause, supported by oath or affirmation reduced to writing in the Youth Court proceedings, upon which to base the issuance of the warrant of arrest.
From the record, therefore, the initiation of the Youth Court proceedings against Woods on March 18, 1981, his earlier arrest in Oklahoma, and his subsequent detention in *406 Flathead County during the Youth Court proceedings were all patently unlawful. Yet, it avails Woods nothing. An illegal arrest of a defendant does not preclude the State from proceeding on a criminal charge against him. In United States v. Crews (1980), 455 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537, the Supreme Court stated:
“Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction (citing cases). The exclusionary principal of Wong Sun [v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] and Silverthorne Lumber Company [251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.2d 319 (1920)] delimits what proof the government may offer against the accused at trial, closing the courtroom door to evidence secured by official lawlessness. Respondent is not himself a suppressible ‘fruit,’ and the illegality of his detention cannot deprive the government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.” 100 S.Ct. at 1251.
See also, State v. Ritchson (1981), Mont., 630 P.2d 234, 239, 38 St.Rep. 1015.
We attach no weight, therefore, to Woods’ contentions that his arrest and detention were unlawful or that the Youth Court proceedings were unlawful or not based upon probable cause, or that the petition filed in the Youth Court was deficient.
The crimes with which Woods was charged were alleged to have been committed before he became 18 years of age. He was under the age of 21 years at the time of his arrest. Therefore, the Youth Court had exclusive jurisdiction of the charges against him. Section 41-5-203, MCA. The Youth Court is required to retain jurisdiction unless such jurisdiction is terminated by a transfer of the proceedings to the adult criminal court. Section 41-5-205(1), MCA. *407 Woods complains that the Youth Court proceedings against him should have been dismissed because those proceedings were not decided or determined within 15 days after service of the petition. (Section 41-5-516(1), MCA.) That provision must give way in this case, however, to the necessity for a transfer hearing whether Woods should be tried in the adult criminal court. Section 41-5-206, MCA, provides that after a petition in Youth Court alleging delinquency has been filed, the county attorney may move, before a hearing on the petition on its merits, to transfer the matter of prosecution to the District Court if the youth were 16 years of age or more at the time of the unlawful conduct, for crimes such as criminal homicide. Section 41-5-206, MCA. The 15-day time limitation of section 41-5-516, MCA, has no application when the charges are subject to transfer to the adult criminal court, and a timely motion as here is made to transfer the proceedings.
Counsel for Woods objected to the transfer of the proceedings from the Youth Court to the District Court, but the Youth Court overruled his objections based upon the deficiencies in the Youth Court proceedings. Under the rule we have stated, even though his arrest and detention may have been illegal, that was not a bar to a subsequent prosecution nor could it be a bar to the transfer of the cause from the Youth Court to the District Court.
But Woods also contends that the information filed in the District Court against him was improper because it too was filed without supporting affidavit or sworn testimony and without leave of court. Woods claims that the information was improperly filed under Art. II, § 20, 1972 Mont. Const., because probable cause was not established after examination and commitment by a magistrate or after leave granted by the court. This contention again has no weight. It overlooks or ignores the transfer hearing held before the Youth Court. There, witnesses were sworn and their testimony given which established beyond cavil probable cause for the filing of the information in the District Court *408 against Woods. The Youth Court made findings of fact which stated that the relevant evidence indicated reasonable grounds to believe that Woods had committed the acts alleged. The Youth Court further found that there was no facility available at Miles City or elsewhere in which Woods could be held or detained if the cause was retained in the Youth Court and that the gravity of the offense required the transfer of the prosecution to the District Court. The Youth Court therefore ordered that an information charging Woods be filed in the District Court. Thus, Woods did in fact receive a hearing before an impartial magistrate, the Youth Court, which ordered the county attorney to file the information in the District Court. We determine that such procedure satisfied the state constitutional requirements that criminal actions in District Court be initiated either by information after examination and commitment by a magistrate or after leave granted by the court.
We now examine Woods’ contention that there was no corroboration of the testimony of accomplices sufficient to sustain his conviction. In connection with this issue, we must delineate the facts.
On September 13, 1978, at 11:25 p.m. on Highway 93, Flathead County police officers investigated the injury of two victims found on the shoulder of the highway. One was dead and one was alive. The officers found a 10-speed bicycle badly bent, a plastic grill and grill piece, green paint chips and other evidence. The victims were taken by ambulance to the hospital where one was pronounced dead on arrival and the other survived for approximately 35 to 40 minutes. It appeared that the victims had been run down on the highway while riding their bicycle. The police investigation was futile until 2 Vz years later when an anonymous crimestoppers tip directed them to Bobby Aho, who gave police a signed statement about the night of the killing. His statement indicated that Woods had been driving around Kalispell with Jerry Schneider and Bobby Aho in Tim Fraleigh’s car. They met the victims, Kessner and *409 Johnson, who Woods claimed owed him money for drugs. He was angry that they had neither the drugs nor the money and determined to “get them.” He drove up behind them while the two were riding on one bicycle down Highway 93, sped up and swerved into them. Woods drove on after the collision.
Woods was arrested in Woodward, Oklahoma, on March 18, 1981. At the time, he was nearly 19 years old but was 16 years old at the time of the offense. The Montana Codes required that he be proceeded against in the Youth Court. We have already indicated the proceedings that followed his arrest.
Woods contends that the passengers in his automobile, Schneider and Aho, must be considered accomplices, and that there is no corroboration for their testimony. The State argues that they were not in fact accomplices and that in any event, their testimony was corroborated.
This issue has little weight. The District Court submitted to the trial jury as a question of fact whether Schneider and Aho were in fact accomplices and instructed the jury that their testimony must be corroborated if it found that they were in fact accomplices. Whether the jury so determined or not is of no moment now. There is more than sufficient corroboration of the testimony of Schneider and Aho in the evidence offered on the stand by Wanda Aho, who testified to a conversation she had with Woods where Woods told her that he had been driving the car and that he had killed Kessner and Johnson. That evidence suffices to corroborate and sustain the testimony of Schneider and Aho, if we should grant that they were accomplices. State v. Forsyth (1982), 197 Mont. 248, 642 P.2d 1035, 39 St.Rep. 540; State v. Manthie (1982), 197 Mont. 56, 641 P.2d 454, 39 St.Rep. 350; State v. Mitchell (1981), Mont., 625 P.2d 1155, 38 St.Rep. 487.
The next issue offered by Woods is that the doctrine of cumulative trial error requires a reversal of his conviction.
The errors which Woods argues cumulated against him *410 are:
1. The admission of exhibits 1, 2 and 3, photographs of the scene of the offenses,
2. The color photograph of Ronald Johnson, one of the victims,
3. A damaged bicycle, the testimony of Dale Gifford, respecting inconsistent statements by Woods,
4. The examination of Schneider about his own prior inconsistent statements to the police,
5. The examination of witness Fraleigh, and
6. The rebuttal testimony of the probation officer.
We find no error with respect to this testimony or evidence.
The photographs of the scene were testified to by the officers doing the investigation as depicting the scene as they remembered it. They did not take the pictures themselves nor were they taken under their direction. The officers came to the scene a very short time after the incident occurred. It is clear that the photographs would aid the jury in its factfinding process. State v. Austad (1982), 197 Mont. 70, 641 P.2d 1373, 39 St.Rep. 356, 362.
The color photograph of the deceased Ronald Johnson was objected to on the ground that its probative value was outweighed by its inflammatory nature. We agree with the State that the photograph lent credence to the testimony of the witnesses for the State that the death of the victim was caused from the injuries they received when they were struck by the automobile. The photographs served a probative purpose and were admissible. State v. Logan (1970), 156 Mont. 48, 473 P.2d 833.
The objection to the admission of the bicycle-was on the grounds of foundation, that there was no sufficient evidence that the bicycle was in the same condition as at the time of the incident and no chain of evidence establishing to whom it belonged and its condition prior to and after the incident. The testimony indicated that the investigating officer had picked up the bicycle at the scene of the offenses, *411 and that it appeared to be in reasonably the same condition at trial as it was when he first picked it up. There was no indication at trial that the bicycle had otherwise been tampered with or was in worse condition than when it was found. We see no problem with the admission of the bicycle into evidence.
The testimony of Dale Gifford was to the effect that he had talked to Woods after his arrest while the Youth Court proceedings were pending, and that Woods had given him an alibi which was different from one given to Gifford earlier in 1979 when he had questioned Woods. The objection to this testimony, in Woods’ briefs, seems to be that since Woods had not testified and did not eventually testify, such evidence of his statements was inadmissible. The testimony was relevant, and indeed was not objected to at the time of trial.
The medical testimony showed that no autopsies were performed on the bodies of the victims and the medical persons testified their conclusion that the collision with the automobile had brought about the injuries which caused the deaths was an “educated guess.” However, the medical testimony was that the type of injuries suffered by the victims were consistent with the injuries one might expect to receive if struck by an automobile. Again no objection was raised on this ground to the doctor’s testimony at trial. The weight of the medical evidence was for the jury.
On direct examination, the State brought out from Jerry Schneider that he had made inconsistent statements earlier which were different from the statements he was making at the trial with respect to the incident. The objection was that the testimony of the earlier statements was hearsay and that it was improper for the State to preclude impeachment of Schneider by asking about the inconsistent statements first. Rule 801(d)(1)(A), M.R.Evid. provides that prior inconsistent statements of witnesses are not hearsay as long as the witnesses testifying at the trial are subject to cross-examination concerning the statement. Under that *412 rule, prior inconsistent statements are admissible as substantive evidence, See Commission Comments, Rule 801, M.R.Evid.
The objection to Fraleigh’s testimony comes about from a question by the county attorney to Fraleigh “did you carefully examine the car for any little scratch every-time Jake would return it to you?” The question could have been better phrased. It is not prejudicial.
Glenn Hufstetler, the chief probation officer, on rebuttal, testified that Woods’ mother had told him that she knew Woods had been trying out the automobile which was involved in this incident for a three week period, including the date of the incident. Objection was made that the testimony was improper rebuttal evidence. The State contends that the testimony tended to overcome the legal effect of the mother’s evidence, which taken as a whole permitted the jury to infer that she kept careful watch over her sons and was well aware of what they did and where they were. The State contends that Hufstetler’s testimony shows her awareness of the fact that Woods was driving Tim Fraleigh’s car at the time the incident occurred. Again, the admission of testimony or evidence is mainly a matter of discretion with the lower court.
All in all, we find no cumulative error. Certainly any such cumulative error must be enough that taken as a whole it appears to the appellate court that the effect of the claimed cumulative error was to deprive the defendant of a fair trial. We cannot so conclude on the matters claimed here as cumulative error.
We turn now to examine Woods’ contentions that the District Court erred in giving certain instructions objected to by Woods.
The full content of such instructions are:
“Instruction 9A:
“You are instructed that under Montana law, a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware *413 of his conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly , probable that such result will be caused by his conduct.
“Instruction 14:
“You are instructed that if you find the defendant committed a homicide and that no circumstances of mitigation, excuse, or justification appear, you may then infer that the homicide was committed knowingly or purposely.”
Woods’ objections to court’s instruction no. 9A are that it does not require the State to prove each element of the case beyond a reasonable doubt, it does not tell the jury what the effect of presumptions supplying such proof is, and it shifts the burden of proof in a criminal case. Woods’ objection to the court’s instruction no. 14 is that it permitted the jury to infer every criminal state of mind required for a conviction, merely on the finding that a homicide had been committed.
Court’s instruction no. 9A is stated in the words of the statute defining “knowingly,” section 45-2-101(33), MCA.
The instructions given here, and the objections made by Woods thereto, are nearly identical to the instructions and objections that were raised in State v. Coleman (1979), Mont., 605 P.2d 1000, 1052-1056, 36 St.Rep. 1134, cert.den. 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831, reh.den. 448 U.S. 914 101 S.Ct. 34, 65 L.Ed.2d 1177 (1980). There, as here, the defendant contended that the given instructions offended the holding of the United States Supreme Court, particularly in Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39; and United States v. United States Gypsum Company (1978), 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854. With respect to the instruction nearly identical to court’s instruction no. 14 here, we said:
“The holding in Sandstrom is not to be construed to mean that whenever a trial court instructs a jury that it may resort to inference to determine subjective matters, such as *414 knowledge or purpose, that thereby the State has been relieved of its burden of proof. The United States Supreme Court did not intend such limitation, and we do not find any such intention in the language of Sandstrom or its related cases. The jury was not allowed to rest solely upon the permitted inference in the Coleman case, but under the instructions, had to require such an inference to meet the standard as beyond a reasonable doubt.
“The true test under Sandstrom, in determining the effect of an instruction such as the one disputed here is whether that instruction has the effect of allocating to the defendant some part of the burden of proof that properly rests on the State throughout the trial. See Holloway v. McElroy (D.Ga.1979), 474 F.Supp. 1363, 1368. We do not find that to have occurred here.
“On that basis we distinguish the Coleman instruction from those cases involving a burden-shifting presumption as in Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508; and conclusive presumptions like those involved in Sandstrom, supra, Morrissette v. United States (1952), 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, and United States v. United States Gypsum Company (1978), 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854. Instead, the inference is purely permissive, in the sense described in County Court of Ulster County v. Allen (1979), 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777.” 605 P.2d at 1054.
With respect to the instruction similar to court’s instruction no. 9A here, we said:
“When the holdings in Sandstrom and United States Gypsum Company are understood in that context, one may examine the instruction ‘knowingly,’ complained of here, and determine that the factfinding duty of the jury is not invaded by the court. The District Court is not usurping a jury function when it instructs ‘a person acts knowingly with respect to the result of conduct [constituting a crime] when he is aware that it is highly probable that such result [would] be caused by his conduct.’
*415 “The jury is not called upon to determine ‘high probability’ in place of ‘reasonable doubt;’ rather it is called on to determine the existence of defendant’s awareness, beyond a reasonable doubt, that a high probability is that the result of his conduct makes his conduct criminal. The District Court here did not, by using this instruction, make it mandatory upon the jury to find defendant’s awareness nor conclusively presume his awareness. That finding was left exclusively to the jury. In short, the instruction did not establish a presumption which testimony could not overthrow. On that basis, therefore, we find no merit in the second ground of attack.” 605 P.2d at 1055.
Since we have fully examined the contentions that Woods makes here in connection with nearly the same instructions in Coleman, we see no reason now to find prejudice or error with respect to virtually the same instructions given here by the court.
The final issue that appears in the briefs is whether court-appointed counsel for purposes of appeal are entitled to receive compensation for their services from the county involved. Counsel agreed at oral argument that such an issue has no part as a contention to be considered in connection with a defendant’s appeal. We therefore make no decision here as to whether counsel is entitled to receive attorney fees at county expense.
The judgment of conviction of the defendant is affirmed.
MR. CHIEF JUSTICE HASWELL and JUSTICES HARRISON, WEBER, MORRISON and GULBRANDSON concur.